# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## TERRE HAUTE DIVISION

LOUIS H. EARLY,                       )

                                  )

              Plaintiff,          )

                                    )

              v.                )      No. 2:16-cv-00085-JMS-MJD

                                    )

R. D. SHEPHERD,                 )

KIMBERLY RHOADS,           )

CHRISTOPHER McCOY,       )

UNITED STATES,               )

                                  )

              Defendants.      )

## Entry Granting in Part and Denying in Part
## Individual Defendants' Motion for Summary Judgment and
## Denying United States' Motion for Summary Judgment

Plaintiff Louis H. Early, a federal inmate, alleges that he is entitled to monetary relief because he received inadequate treatment for his abscessed tooth. The United States of America is allegedly liable under the Federal Tort Claims Act ("FTCA") based on the theory that Dr. R.D. Shepherd, the Chief Dental Officer at the Federal Correctional Complex in Terre Haute, Indiana, provided Mr. Early with inadequate dental care.[1] Dr. Shepherd, Ms. Kimberly Rhoads, and Mr. Christopher McCoy (collectively, the "individual defendants") are allegedly liable pursuant to the theory recognized in *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971). Mr. Early alleges that Ms. Rhoads was deliberately indifferent to his dental needs in violation of the

---

[1] For the reasons explained in the Entry of October 17, 2017, Dr. Shepherd is a Public Health Officer and was granted immunity under 42 U.S.C. § 233(a) for the Eighth Amendment claim alleged against him and the retaliation claims related to the performance of dental functions. Consistent with § 233, the Court substituted the United States as defendant to the claim that Dr. Shepherd provided Mr. Early with inadequate dental care under the FTCA. Dkt 100.

Eighth Amendment, and that both Ms. Rhoads and Dr. Shepherd retaliated against him for filing grievances, in violation of the First Amendment.[2]

All defendants seek resolution of the claims alleged against them through summary judgment. Mr. Early concedes that defendant Christopher McCoy should be granted summary judgment because there is insufficient evidence to support a claim of deliberate indifference or retaliation against him. *See* dkt 127 at p. 16. Accordingly, all claims against Mr. McCoy are dismissed and he is entitled to judgment as a matter of law.

The United States argues that Mr. Early cannot establish that the United States was negligent with respect to the dental care he received from Dr. Shepherd. The individual defendants argue that they are entitled to summary judgment because Ms. Rhoads was not sufficiently involved in the dental treatment that Mr. Early received and because *Bivens* liability does not extend to retaliation claims.

For the reasons explained below, the United States' motion for summary judgment, dkt [117], is **denied.** The FTCA claim against the United States based on the dental care provided to Mr. Early shall proceed. The individual defendants' motion for summary judgment, dkt [115], is **granted** to the extent that the retaliation claims are dismissed. This resolves all claims against Dr. Shepherd. The individual defendants' motion for summary judgment, dkt [115], is **denied** to the extent that the Eighth Amendment deliberate indifference claims against Ms. Rhoads shall proceed. The United States' and individual defendants' collective motion to exclude the expert testimony of Dr. Jesus Cortes, dkt [137], is **denied.**

---

[2] Section 233(a) does not shield Dr. Shepherd from responsibility for retaliatory actions that were not taken in the performance of his official duties. Specifically, the claim that Dr. Shepherd had Mr. Early's cell searched in retaliation for complaining about his dental care is proceeding against Dr. Shepherd.

# I. Standard of Review

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

# II. Material Facts

Because the Court must view the facts in the light most favorable to the non-moving party and all reasonable inferences are drawn in the non-movant's favor, the following facts are not

necessarily objectively true, but are construed in favor of Mr. Early for the purposes of resolving the pending motions for summary judgment.

**A. Dental Care at FCI Terre Haute**

Mr. Early has been incarcerated at the Federal Correctional Institution in Terre Haute, Indiana, ("FCI Terre Haute") since November 2013.

Dr. R.D. Shepherd is the Chief Dental Officer for the Federal Correctional Complex in Terre Haute ("FCC Terre Haute"). Dr. Shepherd is primarily responsible for the inmates assigned to FCI Terre Haute and the Federal Prison Camp. Dr. Jesus Cortes and Dr. Buckley are dentists primarily responsible for the United States Penitentiary ("USP") inmates. At FCI Terre Haute, Dr. Shepherd works with one dental hygienist, Kimberly Rhoads, and one dental assistant, Angie Whitlock.

Ms. Rhoads is a registered dental hygienist that began working at FCC Terre Haute in 2013. As a dental hygienist, Ms. Rhoads does not interpret x-rays and cannot prescribe antibiotics.

On weekday mornings, Dr. Shepherd and Ms. Rhoads have dental sick call triage, during which inmates present a complaint form to either Dr. Shepherd or Ms. Rhoads, who then is supposed to visually examine the inmates and ask questions about their complaints and pain levels. The inmates are then scheduled for an appointment according to their complaints, usually within one to two days.

If someone has a dental issue over the weekend, there are nurses available that can call Dr. Shepherd or Dr. Cortes if there is an urgent dental need or question. The patients who present for sick call take priority over routine dental care.

The Bureau of Prisons (BOP) has a National Waiting List for dental care, which is a data bank for the entire BOP. When an inmate at FCI Terre Haute reaches the top of the National Waiting List, he is placed on the institutional call-out list to come down for his appointment. Ms. Rhoads reviews his medical history in the BOP electronic medical record system, takes x-rays, which usually consist of four bite wings, and cleans his teeth. Once the cleaning is complete, Dr. Shepherd discusses a proposed treatment plan with the inmate and gets him scheduled for that treatment. Inmates can refuse the proposed treatment, such as filling or extraction. As part of the refusal process, inmates are counseled regarding the risks of refusing the treatment and must sign a refusal form.

The BOP's electronic medical records can be accessed at a later time and changes can be made, but the original entry is shown in its entirety, even if the provider is making an amendment to the entry.

In 2014 and 2015, Christopher McCoy was the Assistant Health Services Administrator ("AHSA") at FCI Terre Haute, where Mr. Early was housed. As AHSA, Mr. McCoy handled the administrative aspects of the Health Services Department, such as ensuring that there was sufficient staff to run the pill lines and see patients and that there were processes in place to meet the needs of the patient, the doctor's orders, and medication needs. In his role as AHSA, Mr. McCoy was not allowed to dictate clinical practice and was not involved in treating patients at all. He could not prescribe antibiotics.[3]

**B. Early's Dental Care at FCI Terre Haute**

---

[3] The only dental staff who could prescribe antibiotics were Dr. Shepherd, Dr. Cortes, and Dr. Buckley.

Mr. Early's dental care at FCI Terre Haute was delayed because his placement on the National Waiting List was incorrectly altered. Mr. Early originally requested care on October 20, 2010. Mr. Early was then transferred to FCI Terre Haute and again requested dental care on November 2013. As a result, Mr. Early's original request was marked completed and the new request was started. On or about September 28, 2015, this error was corrected to reflect his original request-for-care date of October 20, 2010. The correction was made by Justin Vos, a dentist and U.S. Public Health Service Program Manager for the BOP in Washington D.C., in response to one of Mr. Early's administrative grievances. Dkt 128-14 at p. 3 (email exchange dated September 28, 2015).

Mr. Early visited health services on April 25, 2015, seeking treatment for throbbing pain in his left, back, lower tooth. He was prescribed Amoxicillin and told to report to dental for follow-up.

On Monday, April 27, 2015, Mr. Early appeared for a dental sick call triage for a tooth complaint on his lower left tooth. Mr. Early reported that he had been placed on antibiotics and pain medication over the weekend. The medical record reflects that Dr. Shepherd noted a "slight swelling on the lower left" and that Mr. Early's pain level was a two on a scale of zero to ten. Mr. Early, however, was not examined by Dr. Shepherd. He was only seen by Ms. Rhoads, the dental hygienist.[4] Ms. Rhoads visually examined Mr. Early in the hallway outside of dental and instructed

---

[4] In a July 14, 2015, email to Dr. Shepherd, Dr. Donald L. Ross, the Regional Chief Dentist, recommended that Dr. Shepherd change the dental clinic's charting policy so that the patient's records reflect who actually performed the work, not simply who signed off on it after the fact. Specifically, Dr. Ross stated:

> Looking at Mr. Early's notes it gives the appearance that you personally examined him and made a disposition. If the RDH/DA [dental hygienist/dental assistant] do the triage but youi [sic] have not had the patient in the chair and looked at him, even if you are in the

him to complete the Amoxicillin regimen he was prescribed over the weekend. She said he was to be seen by Dr. Shepherd after that. Mr. Early was scheduled for the next available appointment. Anthony Calabrese, a dental clinic orderly, who witnessed this encounter, testified:

> I observed Early provide a sick call slip to Rhoads, and explain that he was there for emergency sick call, having been prescribed amoxicillin over the weekend, and that he was in pain. Rhoads told Early to continue the antibiotic treatment, and that he would be placed on call-out for treatment. All of the interaction between Rhoads and Early took place in the hallway outside of Dental, and at no time was Early brought into the Dental Office. At no time was Shepherd present, nor did he examine Early.

Dkt 128-10 (Calabrese Aff., ¶¶ 12-15) (quote modified for formatting and to exclude numbering).

If Dr. Shepherd determines that antibiotics are warranted, he usually prescribes a regimen of three to five days because he believes this is a good window for the inmate to be out of pain and comfortable for his follow-up appointment.

From April 27 to April 30, 2015, Mr. Early reported to the pharmacy to receive his Amoxicillin, but was repeatedly denied.

There is an email dated April 29, 2015, at 11:46 a.m. in the record from Nicole Clingerman to Ms. Rhoades and Dr. Shephard with the subject line, "Early" that states in its entirety, "came to pill line looking for ATB???" Dkt 128-12. There is no response to this email in the record.

A dental sick call appointment had been scheduled for Mr. Early that same day, April 29, 2015 (just two days after his sick call visit). Once an appointment for an inmate is made, the appointment is placed on an institutional call-out list, which is placed in the units. However, Mr.

---

room/clinic, the RDH/DA should make a triage note (even taking an x-ray if needed) and you co-sign. Based on that you can then make the disposition for scheduling, prescribing empirically if needed, in an administrative note.

Dkt 128-11 (Email exchange dated July 14, 2015, at 8:16 a.m.).

Early was not placed on the institutional call-out list for April 29, 2015, as a result of problems with the computer system responsible for the institutional call-out list. Thus, Mr. Early was unaware of and unable to attend his scheduled appointment.

On Thursday, April 30, 2015, Mr. Early returned to dental sick call triage complaining of pain in his lower left tooth. Mr. Early first saw Ms. Rhoads and requested more antibiotics. When Mr. Early provided Ms. Rhoads evidence that he was not on the prison's call out for medical appointments on April 29, 2015 and so did not know to report, Ms. Rhoads responded that it was not her problem and she did not care. The total conversation with Ms. Rhoads was 20 words. Mr. Early never acted in a threatening manner toward Dr. Shepherd or Ms. Rhoads.[5]

On May 2, 2015, Mr. Early reported to sick call complaining of pain and discomfort. Mr. Early was seen by RN Corey Pointer. RN Pointer noted swelling to the outside of his jaw and spoke to PA Daugherty, who prescribed Amoxicillin, 500 mg tablets for seven days. Mr. Early was given a three-day starter pack of Amoxicillin and told to follow up with dental on Monday. The medical record regarding this encounter was entered by RN Pointer many days later on May 14, 2015. After Mr. Early's three-day supply of medication ran out, additional pills were not provided.

Apparently, the failure to provide additional medication after the starter pack was depleted was not an isolated event. Dr. Donald L. Ross ("Ross"), the Regional Chief Dentist, suggested that if inmates seeking dental care are seen during the off-shift, that Dr. Shepherd or Dr. Cortes should be the ones selected for co-sign or review. He stated this would ensure that the dentist is aware of the case and medications can be extended or continued if necessary. He suggested such a change

---

[5] There is a dispute regarding whether Mr. Early raised his voice and became angry or aggressive. Ms. Rhoads testified that she felt uncomfortable and asked Dr. Shepherd to step in. There is a further dispute regarding whether Dr. Shepherd stepped in and examined Mr. Early on April 30, 2015. Dr. Shepherd testified that he noted no swelling or drainage at the time and that Mr. Early's pain level was two out of ten.

would provide clearer documentation and promote continuity of care. Dkt 128-14 at p. 2-3 (September 28, 2015, email).

On Tuesday, May 5, 2015, Mr. Early visited the dental clinic. This was 10 days after his April 25, 2015, sick call visit regarding his complaints that his lower left molar, Tooth No. 19, was hurting. When Mr. Early first arrived for the appointment, Dr. Shepherd confronted Mr. Early by placing two grievances Mr. Early had filed on the table and stating that Mr. Early was "showing his ass" by filing grievances about his dental care.

At Dr. Shepherd's direction, Angie Whitlock, a dental assistant, took a periapical x-ray of the abscessed tooth, which is a photographic image of the tooth itself. The x-ray showed that Mr. Early had bone loss and a deep large filling on the tooth. Mr. Early came into BOP custody with this pre-existing filling on Tooth No. 19. When a filling on a tooth is large—as Mr. Early's was— the tooth is more likely to need removal because the more tooth structure that is removed, the more likely the tooth will be lost in the long term. The filling on Mr. Early's Tooth No. 19 was an extremely large restoration that was sitting right on the nerve of the tooth. When a filling is that close to the nerve, the long-term chances of saving the tooth are very small. Upon x-ray, Mr. Early had an abscess—or accumulation of pus—at the bottom of his tooth. Antibiotics will not make the abscess go way. However, the antibiotics reduce the infection to alleviate the pain.

The dental record reflects that Dr. Shepherd physically evaluated Mr. Early's tooth, but he did not. According to Mr. Early, Dr. Shepherd did not physically examine him before deciding to pull the tooth and instead based his treatment decision on solely the x-ray. Dr. Shepherd concluded that the tooth was non-restorable and recommended an extraction. An extraction treats an abscess

by removing the source of the infection, at which point the body destroys whatever infection is left without the need of antibiotics.

Mr. Early inquired about the withholding of his Amoxicillin prescriptions and asked Dr. Shepherd to at least examine his tooth before deciding it must be removed. In response, Dr. Shepherd got upset and stated:

> [L]et me tell you something, I'm the clinic director, if I don't want to treat you, I won't. And I [Mr. Early] said, well, sir, I'm not going to allow you to pull my tooth without an exam and without explaining to me why the Amoxicillin was discontinued. He started literally yelling at me, shut up, sit down. I said okay. So I sat down, and he went and got Mr. McCoy.

Dkt 128-2 (Early Dep., 18:22-20:7). The dental orderly, who witnessed the incident, confirms this version of events:

> Shepherd began screaming at Early, telling him he was not the Dentist and words to the effect that he did not have to even treat Early if he did not want to . . . Shepherd became louder and louder, yelling at Early to shut up, stay seated, and that he was not getting treated.

Dkt 128-10 (Calabrese Aff., ¶¶ 35-40).

Ms. Rhoads also witnessed this exchange. Mr. Early then met with Mr. McCoy, who had Mr. Early sign a refusal of treatment.

Under "Objective" assessment in Dr. Shepherd's administrative notes from this appointment, Dr. Shepherd wrote:

> Patient points to #19 which has a [sic] overrestored large DO alloy. Class I mobility. No swelling noted. Positive to percussion. X-ray shows defective restoration with periapical changes. Tooth is non restorable. Patient does not want extraction done until put on antibiotics. Patient told antibiotics not warranted at this time. Patient trying to dictate treatment. Wants to argue about tooth not being fixed over a year ago and waiting list policy. Refusal signed.

Dkt 117-13 at p.1 (Health Services Admin. Note by Shepherd, May 5, 2015). Under "Plan" in the same administrative note, Dr. Shepherd stated: "Patient told issue will get worse and antibiotics will not be written due to refusal. Patient just kept interrupting and was escorted out of clinic." *Id.*

That same day, on May 5, 2015, Mr. Early filed another grievance describing the incident at the dental clinic earlier that day when Dr. Shepherd confronted Mr. Early about the grievances he had filed:

> I am writing to request that the dentist Shepherd, not continue to retaliate against me for filing an administrative remedy against dental. After repeated delay, I was scheduled for dental call out on 5-5-2014 [sic]. I reported for the same. The dentist never looked in my mouth.

> While I did not accede to his wish that he pull my tooth, I nonetheless was verbally abused for filing a BP-8. He specifically stated that 'I was showing my ass,' that I was not a dentist, and that he could do what he wanted.

> I believe that being profanely insulted is inappropriate, and that had I acted or spoken in such an insulting manner, I would have been sanctioned for insolence. His behavior and actions are unprofessional and clearly in retaliation for my exercising my rights under the Administrative remedy process.

Dkt 128-22 (BP-8 Form dated May 5, 2015).

On September 28, 2015, in response to Mr. Early's complaint, Dr. Shepherd again corresponded with Dr. Ross about the quality of care provided to inmates. Dkt 128-14 (Shepherd/Ross Emails from September 28, 2015, p. 1-2). Dr. Ross pointed out to Dr. Shepherd: "While [Early] is 'persistent' he did bring about a point [regarding continuity of care] that needed to be fine-tuned." *Id.* at 1. Dr. Shepherd responded: "Do remember this is the inmate that threatened Rhoads . . . We wrote him up, but it didnt [sic] stick due to the Captain didnt [sic] feel it was threatening." *Id.*

On November 17, 2016, Dr. Cortes, the dentist primarily responsible for treating inmates at the USP, came over to FCI Terre Haute with his dental assistant to treat Mr. Early. Upon assessing Mr. Early, Dr. Cortes requested a couple of specific x-rays to determine if some questionable teeth were abscessed. One of those teeth was Tooth No. 19, which had a chronic abscess on it. Dr. Cortes recommended that Tooth No. 19 be extracted because of the abscess.

Looking at the previous x-ray taken of Tooth No. 19, Dr. Cortes agreed that the tooth was not restorable at the time and saw little change between the x- ray he ordered in November 2016 and the previous x-ray from May 2015. Dr. Cortes then extracted Tooth No. 19. Although Dr. Cortes prescribed Mr. Early a Schedule 2 narcotic after the extraction, he did not prescribe Mr. Early any antibiotics. On November 29, 2016, Dr. Cortes saw Mr. Early at the FCI Terre Haute again, placing three stainless crowns and replacing a temporary filling with a permanent silver filling.

Subsequently, after Dr. Cortes finished all of Mr. Early's treatment, Mr. Early was called back down to the dental clinic for a cleaning, which was to be provided by Dr. Shepherd or Ms. Rhoads as Mr. Early was housed in the FCI Terre Haute. Ms. Rhoads, however, did not feel comfortable treating Mr. Early, leaving Dr. Shepherd to do the cleaning. Mr. Early refused to allow Dr. Shepherd to perform the cleaning and insisted that he wanted Dr. Cortes to treat him. Mr. Early was removed from the National Waiting List based on this refusal.

## C. Opinion of Dr. Michael E. Sovanich, DDS

Dr. Michael E. Sovanich, a licensed dentist who serves as an Adjunct Assistant Clinical Professor in Comprehensive Care and General Dentistry for Indiana University School of Dentistry, reviewed Mr. Early's dental records from FCI Terre Haute. Dr. Sovanich opined that Dr. Shepherd did not deviate from the accepted standard of care during treatment of Mr. Early's lower left molar (Tooth No. 19) and that nothing Dr. Shepherd did caused injury to Mr. Early.

In Dr. Sovanich's opinion, antibiotics would never have cured Mr. Early's dental infection nor would it have allowed Mr. Early to keep his tooth. As Dr. Sovanich opined, antibiotics are not risk free, nor are they a cure-all. Repeated dosing with antibiotics can result in an allergic reaction, which can be life threatening. Unwarranted use of antibiotics can also result in bacterial resistance, making them less effective when they are truly needed. In Dr. Sovanich's opinion, Dr. Shepherd was offering the correct remedy, but, by refusing appropriate treatment by Dr. Shepherd, Mr. Early was the direct cause of his prolonged infection, pain and suffering.

Dr. Sovanich's testimony does not include any statement approving of the interruption of a prescribed course of antibiotics. Nor is there any dispute that antibiotic treatment can alleviate (at least temporarily) the pain associated with an abscessed tooth.

## D. Opinion of Dr. Jesus Cortes

Dr. Jesus Cortes has worked as a dentist for the BOP for more than seven years and as an Air Force dentist for 26 years before that. He has also served as a fellow of the American Academy of General Dentistry. Dr. Cortes testified regarding his treatment of Mr. Early specifically and prescribing antibiotics to his incarcerated patients generally. Dr. Cortes was asked at his deposition, "When you prescribe antibiotics for a patient, how do they actually get the pills?" In

response, Dr. Cortes explained that when he prescribes antibiotics, he normally goes to the pharmacy and gives the patient a starter pack which includes about a three-day supply. He then enters the prescription into the computer, so the pharmacy can fill the remainder of the prescription. He explained that it takes a few days for the pharmacy to fulfill the order. Dkt 129-4, (deposition pages 12-13).

Dr. Cortes testified that he would never prescribe a patient with a dental infection just three days' worth of antibiotics and that a seven to ten day regimen of antibiotics is the standard prescription for dental infections according to the American Dental Association ("ADA") and American Medical Association ("AMA"). Dr. Cortes further opined that it is very important not to terminate a patient's prescribed antibiotics regimen before it is finished. He explained:

> It is important because first of all we like to practice by the book, and that's what the book says it should be given for seven to ten days and I know exactly why because it takes that amount of time to kill a lot of the inoculum [the bulk of the bacterial infection]. . . And secondly, because bacteria are consistently multiplying. If you interrupt, you allow them to repopulate.

*Id.* at 13.

When asked whether just giving a patient a three-day starter pack could negatively affect a patient's dental health, Dr. Cortes testified:

> If I'm going to see that patient within the next two or three days it's not a problem because once we render the treatment that we're going to render, name it a root canal or an extraction, the infection pretty much kind of stops there either through the drainage or through the process of doing the root canal.

*Id.* at p. 14. If Dr. Cortes was not going to see a patient within two to three days, he would normally make sure to get the seven-to-ten day prescription. He then reiterated that a three-day supply of antibiotics is sufficient to treat a dental infection if he sees the patient within that period of time. *Id.* His opinion is based on the standards set forth by the ADA and the AMA. *Id.* at 15.

14

The defendants seek to exclude the expert testimony of Dr. Cortes on the basis that they had inadequate notice that Mr. Early intended to use Dr. Cortes as an expert. The motion to exclude expert testimony of Dr. Jesus Cortes, dkt [137], is **denied.** The reason for this ruling is that Dr. Cortes's opinion is helpful to understanding the issues in this case. Moreover he is an agent of the United States. If the defendants require additional discovery to address Dr. Cortes' expert opinions, within seven days from the date this Entry is docketed, they may file a motion to reopen discovery with a statement of what additional discovery is necessary given his expert opinion.

### III.  Discussion

The following claims remain in this action: (1) FTCA claim against the United States based on the allegedly negligent dental care Mr. Early received; (2) Eighth Amendment deliberate indifference claim against Ms. Rhoads; and (3) First Amendment retaliation claim against Ms. Rhoads and Dr. Shepherd. Each of these claims is discussed below.

### A. FTCA Claim

Mr. Early argues that he endured months of pain as a result of the negligent dental care he received at the hands of Dr. Shepherd. The United States argues that it is entitled to summary judgment because the care Dr. Shepherd offered was appropriate and it was Mr. Early's refusal of the recommended course of treatment that resulted in his continued pain.

The law that applies in this case is the FTCA. Whether a FTCA claim can be made against the United States depends on whether a private entity under like circumstances would be liable "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). Because the actions Mr. Early complains of occurred in Indiana, Indiana law applies to this case.

The United States argues that to survive summary judgment, Mr. Early must have

evidence to support a medical malpractice claim. The elements of such a claim are: "'(1) that the [United States] owed a duty to the plaintiff; (2) that the [United States] breached that duty; and (3) that the breach proximately caused the plaintiff's injuries.'" *Siner v. Kindred Hosp. Ltd. P'ship*, 51 N.E.3d 1184, 1187 (Ind. 2016) (*quoting Mayhue v. Sparkman*, 653 N.E.2d 1384, 1386 (Ind. 1995)). To prove causation, a plaintiff must present specific facts that would demonstrate that defendant's allegedly negligent behavior caused the plaintiff's injuries. *Midwest Commerce Banking Co. v. Livings*, 608 N.E.2d 1010, 1013 (Ind. Ct. App. 1993); *see also Topp v. Leffers*, 838 N.E.2d 1027, 1032 (Ind. Ct. App. 2005) (stating that proving proximate causation requires that the plaintiff show "a reasonable connection between a defendant's conduct and the damages which a plaintiff has suffered").

There is no disagreement that the BOP owed a duty of care to Mr. Early during his incarceration at FCI Terre Haute. 18 U.S.C. § 4042(a)(2) ("The Bureau of Prisons . . . shall provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons . . . convicted of offenses against the United States. . . ."); *see also Gottlieb v. United States*, 624 F. Supp. 2d 1011, 1025 (S.D. Ind. 2008) ("Indiana law recognizes that a custodian has a legal duty to exercise reasonable care to preserve the life, health and safety of a person in custody.") (internal citations omitted).

The issue is whether Dr. Shepherd, a BOP employee, breached his duty to Mr. Early. Mr. Early argues that summary judgment cannot be granted because Dr. Shepherd's withholding of antibiotics breached the standard of care and caused Mr. Early pain and suffering. In response, the United States argues that Dr. Shepherd did not breach the standard of care or cause Mr. Early's injuries.

The parties' briefing focuses on whether Dr. Shepherd breached the standard of care in not prescribing Mr. Early antibiotics on May 5, 2015. This reads the claim far too narrowly. This is not an Eighth Amendment medical care claim. This is a FTCA claim where liability can based on the actions of more than one federal employee. For the purpose of this negligence claim, the issue is not solely whether Mr. Early was injured as a result of Dr. Shepherd's failure to prescribe antibiotics to Mr. Early on May 5, 2015, or whether Mr. Early's ongoing pain was a result of his refusal of treatment on that date.

The scope of the FTCA claim is narrowed only by Mr. Early's Claim for Damage, Injury, or Death that was presented to the BOP on or about July 20, 2015. *See* dkt 139. That claim sought $50,000.00 in damages for loss of tooth, tooth deterioration, recession and or bleeding gums, dental pain, anxiety and anguish. That tort claim explains that Mr. Early received a routine dental cleaning in April 2013 and sought, but was denied, another cleaning until May 5, 2015.[6] On April 25, 2015, he had an abscessed tooth. He was twice prescribed Amoxicillin but was not able to obtain a complete course of that medication. He sought care at the dental clinic, but was not seen by the dentist, even though the dental records inaccurately reflect that he was evaluated by Dr. Shepherd. Mr. Early was scheduled for an appointment but was unable to attend because his name did not appear on the facility's call out list. Mr. Early was blamed for his inability to present himself for the appointment. When Mr. Early saw Dr. Shepherd on May 5, 2015, Dr. Shepherd was abusive and announced that the tooth would be pulled and no antibiotics would be provided before conducting any evaluation.

---

[6] This is the date, Mr. Early refused Dr. Shepherd's treatment. Apparently, he was not offered a cleaning until November 17, 2016, when Dr. Cortes provided care.

The record in case considered in the light most favorable to Mr. Early reflects that Dr. R.D. Shepherd was the Chief Dental Officer responsible for providing dental services to inmates such as Mr. Early. The BOP had a duty to provide routine and emergency dental care that Mr. Early did not receive and as a result Mr. Early's teeth deteriorated and he suffered unnecessary pain. The following breaches could be seen to have contributed to the failure to timely provide necessary dental treatment:

1. A mistake in Mr. Early's placement on the National Waiting List resulted in delayed treatment and dental pain.

2. A computer error resulted in Mr. Early's inability to attend a necessary dental appointment which resulted in delayed treatment and dental pain.

3. There was a practice of entering dental records that suggested that Mr. Early was being evaluated by a dentist when he was not. The result is that the records are unreliable and misleading. This resulted in delayed treatment and dental pain for Mr. Early.

4. Mr. Early had an abscessed tooth that required evaluation and prescription medication that only Dr. Shepherd could provide. Mr. Early was not evaluated by the dentist, instead his mouth was looked at by a dental hygienist in the hallway whose conduct precluded him from receiving the additional medication that sick call had contemplated.

5. On at least two occasions, medical providers prescribed a course of antibiotics to Mr. Early, gave him a three-day starter pack, and then BOP employees (including Dr. Shepherd) failed to take the necessary steps for the pharmacy to provide Mr. Early with the full prescription. This resulted in unnecessary pain.

6. During Mr. Early's May 5, 2015, appointment Dr. Shepherd was hostile towards Mr. Early for questioning the dental care he had been provided through the grievance processes and failed to conduct any physical examination of Mr. Early's mouth prior to announcing (without patient counseling) that the abscessed tooth would be pulled.

The United States had a duty to provide Mr. Early with dental care. Timely dental care was not provided and Mr. Early suffered unnecessary pain as a result. Accordingly, the United States'

motion for summary judgment, dkt [117], is **denied.** This claim shall be resolved through settlement or a bench trial.

**B. Eighth Amendment Claim**

Mr. Early argues that Ms. Rhoads' failure to facilitate appropriate treatment of Mr. Early's tooth abscess caused by a bacterial infection amounts to deliberate indifference. Mr. Early argues that he endured months of pain because Ms. Rhoads repeatedly turned Mr. Early away from the dental clinic without administering proper care. Ms. Rhoads argues that she is entitled to summary judgment because there is no evidence that she was personally involved in treating Mr. Early's periapical abscess on his lower left jaw area.

Pursuant to the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement, meaning, they must take reasonable measures to guarantee the safety of the inmates and ensure that they receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *see Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").

To prevail on an Eighth Amendment deliberate indifference to medical care claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed, but disregarded that risk. *Farmer*, 511 U.S. at 837; *Pittman ex rel. Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014).

There is no dispute that Mr. Early's abscess was objectively serious. Instead, Ms. Rhoads argues that she was not sufficiently involved in Mr. Early's treatment to give rise to any liability

under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and that she lacked the requisite intent for a finding of deliberate indifference. "[C]onduct is 'deliberately indifferent' when the official has acted in an intentional or criminally reckless manner." *Board v. Freeman*, 394 F.3d 469, 478 (7th Cir. 2005).

> To determine if a prison official acted with deliberate indifference, we look into his or her subjective state of mind. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996) (citing *Farmer*, 511 U.S. at 842, 114 S.Ct. 1970). . . . [T]he Supreme Court has instructed us that a plaintiff must provide evidence that an official actually knew of and disregarded a substantial risk of harm. *Id*. at 837, 114 S.Ct. 1970. Officials can avoid liability by proving they were unaware even of an obvious risk to inmate health or safety. *Id*. at 844, 114 S.Ct. 1970.

*Pettis v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). To survive summary judgment, the plaintiff need not prove his case. Instead, the plaintiff is only required to present "evidence from which a reasonable jury could infer a doctor knew he was providing deficient treatment." *Id.* at 726.

Mr. Early argues that he experienced severe pain as a result of his abscess for nearly two weeks leading up to his appointment with Dr. Shepherd on May 5, 2015. Mr. Early asserts that Ms. Rhoads personally examined Mr. Early on at least two occasions at dental sick call on April 27, 2015, and on April 30, 2015. Based on these physical examinations, a reasonable fact finder could conclude that 1) Ms. Rhoads knew that Mr. Early suffered from an abscessed tooth, which is an objectively serious medical condition; and 2) given her experience as a dental hygienist, Ms. Rhoads knew the substantial risk of harm – including pain – that the abscessed tooth posed.

A reasonable fact finder could further conclude that Ms. Rhoads disregarded that risk. This is because Ms. Rhoads was tasked with participating in dental sick call triage, during which time she would consider the inmate's complaint, visually examine the inmates, consider the inmate's

pain level and then schedule the inmate for an appointment. In this way, she was responsible for making determinations about inmates' needs for further treatment.

In response, the defendants argue that Ms. Rhoads should not be held liable for Mr. Early's lack of access to the medication he was prescribed because she herself is unable to prescribe medications. This argument is not persuasive, because Ms. Rhoads could and should have referred Mr. Early to Dr. Shepherd to provide the prescription she was not qualified to administer. The evidence is sufficient for a reasonable fact finder to infer that, although a three pill starter pack of antibiotics was provided to Mr. Early at medical sick call, an order from the dentist was required in order to obtain the remainder of course of the medication. This conclusion is supported by the fact that there is an email in the record dated April 29, 2015, at 11:46 a.m., in the record from Nicole Clingerman to Ms. Rhoades and Dr. Shepherd with the subject line, "Early" that states in its entirety, "came to pill line looking for ATB???" Dkt 128-12. Based on this email, it is reasonable to conclude that Ms. Rhoads had responsibility for following up regarding dental patient's prescriptions. This responsibility (even if misplaced) is consistent with the evidentiary record that reflects that Ms. Rhoades filled out dental records that reflected that Dr. Shepherd was the one providing treatment even when she was the only provider the patient saw.

In addition, on April 30, 2015, Ms. Rhoads accused Mr. Early of missing an appointment, which he was unaware of and could not have attended because he was not placed on the call-out list. When Mr. Early provided Ms. Rhoads evidence that he was not on the prison's call out for medical appointments on April 29, 2015, Ms. Rhoads responded that it was not her problem and she did not care.

If Mr. Early's evidence is accepted as true, it is sufficient for a fact finder to conclude that

Ms. Rhoades was deliberately indifferent to Mr. Early's dental needs. Accordingly, Ms. Rhoads is

not entitled to summary judgment in her favor. This claim shall either be resolved through

settlement or a jury trial.

## C. Qualified Immunity

The individual defendants argue that Ms. Rhoads is entitled to qualified immunity for her

improper actions against Mr. Early. They argue that:

> [Ms.] Rhoads could not have reasonably foreseen that her actions were cruel and
> unusual, or even negligent. This is particularly in light of Dr. Sovanich's opinion
> that the treatment Early received for his abscessed tooth did not breach the standard
> of care. . . . Case law demonstrates that a disagreement over the course of treatment,
> or actions that may amount to negligence, do not violate the Eighth Amendment.
> *See, e.g., Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *Snipes v. DeTella*,
> 95 F.3d 586, 591 (7th Cir. 1996).

Dkt 131 at p. 19-20.

"Qualified immunity attaches when an official's conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known."

*White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam ) (alterations and internal quotation marks

omitted). The Supreme Court has explained:

> Although this Court's caselaw does not require a case directly on point for
> a right to be clearly established, existing precedent must have placed the statutory
> or constitutional question beyond debate. In other words, immunity protects all but
> the plainly incompetent or those who knowingly violate the law.

*Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (internal citations and quotations omitted).

In evaluating a claim of qualified immunity at summary judgment, the threshold question to be considered is: "[t]ken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "The law is clear that deliberate indifference to a serious medical condition is a violation of a clearly established constitutional right." *Bd. v. Farnham*, 394 F.3d 469, 481 (7th Cir. 2005) (holding that defendant not entitled to qualified immunity on claim that inmate was denied toothpaste for an extended period of time). "Indeed, '[d]ental care is one of the most important medical needs of inmates.'" *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001) (*quoting Ramos v. Lamm*, 639 F.2d 559, 576 (10th Cir. 1980)).

For the reasons explained above, a fact finder could conclude that Ms. Rhoads was deliberately indifferent to Mr. Early's serious medical condition in violation of the Eighth Amendment and that a reasonable dental hygienist in Ms. Rhoads' position would have known it was improper to delay Mr. Early's evaluation by a dentist and to ignore the fact that Mr. Early, who was suffering from a dental infection, was unable to obtain the remainder of the antibiotics he had been prescribed.

If a jury finds that Ms. Rhoads was responsible for delaying or denying necessary dental care and that her actions were inadequate to meet Mr. Early's serious medical needs, such conduct violates clearly established law under the Eighth Amendment. *See Farmer*, 511 U.S. at 837, 114 S.Ct. 1970; *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010) (finding refusal to refer patient to a dentist actionable because "a basic dental examination is not an expensive or unconventional treatment, nor is it esoteric or experimental") (internal quotation marks omitted). Given that the

threshold factual questions of Ms. Rhoads' states of mind remain disputed, summary judgment on the basis of qualified immunity is inappropriate. *See Petties v. Carter*, 836 F.3d 722, 734 (7th Cir. 2016); *DuFour–Dowell v. Cogger*, 152 F.3d 678, 680 (7th Cir. 1998).

**D. First Amendment Claims**

Mr. Early alleges that Dr. Shepherd retaliated against him for filing grievances by having his cell searched, and Ms. Rhoads retaliated against him by removing him from the National Waiting List for dental care, preventing him from timely obtaining a dental cleaning, and creating inaccurate medical records.[7] The individual defendants argue that they are entitled to judgment as a matter of law on Mr. Early's First Amendment retaliation claims because *Bivens* liability does not extend to these claims.

In *Bivens*, the Supreme Court first recognized an implied right of action for damages against federal officers alleged to have violated a plaintiff's Fourth Amendment right to be free from unlawful search and seizure. *See Bivens*, 403 U.S. at 392–98. Since *Bivens*, the Supreme Court has recognized an implied right of action under the Fifth Amendment's due process clause, *Davis v. Passman*, 442 U.S. 228 (1979), and the Eighth Amendment's prohibition against cruel and unusual punishment, *Carlson v. Green*, 446 U.S. 14 (1980). Following *Carlson*, the Supreme Court has repeatedly refused to recognize *Bivens* actions in any new contexts. *Vanderklok v. United States*, 868 F.3d 189, 198 (3d Cir. 2017).

In *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017), the Supreme Court considered whether "noncitizens who were suspected of having ties to terrorism and detained in harsh conditions in

---

[7] As explained in the Entry of October 17, 2017, Dr. Shephard is entitled to absolute immunity as to those alleged retaliatory acts that relate to the "performance of medical, surgical, dental, or related functions," that are "within the scope of [Defendant Shepherd's] office or employment." 42 U.S.C. § 233(a). Dkt 100 at 6-7.

the aftermath of September 11, could pursue *Bivens* remedies against various high-level federal officials responsible for the policy that authorized their detention and the wardens responsible for their treatment thereafter." *Lanuza v. Love*, No. 15-35408, 2018 WL 3848507, at *3 (9th Cir. Aug. 14, 2018) (citing *Abbasi,* 137 S. Ct. at 1853–54). The Supreme Court declined to extend *Bivens* to these detention policy claims, emphasizing that expanding the *Bivens* remedy is now a "disfavored" judicial activity.

Post-*Abbasi*, additional scrutiny is required before a plaintiff may proceed with a *Bivens* action if the claims arise "in a new *Bivens* context." *Abbasi*, 137 S. Ct. at 1864. "If the case is different in a meaningful way from previous *Bivens* cases determined by this Court, then the context is new." *Id*. at 1859. The Court articulated a two-part test for determining whether *Bivens* remedies should be extended. *Id.* at 1859–60.

> First, courts must determine whether the plaintiff is seeking a *Bivens* remedy in a new context. If the answer to this question is "no," then no further analysis is required. If the answer is "yes," then the court must determine whether "special factors counsel[ ] hesitation."

*Lanuza,* 2018 WL 3848507, at *3 (internal citations omitted) (citing *Abbasi*, 137 S. Ct. at 1860).

In response, to the defendants' motion, Mr. Early argues that his claim is not different in any meaningful way from prior *Bivens* cases decided by the Supreme Court.[8] Thus he is not seeking a *Bivens* remedy in a new context and no additional scrutiny is necessary.

In support of this position, Mr. Early argues that the Supreme Court's decision in *Hartman v. Moore*, 547 U.S. 250 (2006), acknowledged a *Bivens* remedy in First Amendment retaliation

---

[8] Determining whether a case presents a new *Bivens* context is not based on whether a particular circuit has recognized a *Bivens* remedy in a specific context, but whether the Supreme Court itself has recognized a *Bivens* claim in that context. *See Abbasi*, 137 S. Ct. at 1859 ("If the case is different in a meaningful way from previous *Bivens* cases decided by this Court, then the context is new.").

cases. *Hartman* is the only *Bivens* case where the Supreme Court discussed the merits of a First Amendment retaliation claim. In that case, the plaintiff filed a *Bivens* action against a federal prosecutor and postal inspectors, arguing that they had "engineered his criminal prosecution in retaliation for criticism of the Postal Service [in violation of] the First Amendment." *Id.* at 254. *Abbasi*, Mr. Early argues, does not purport to limit, and does not even mention, *Hartman*, which remains good law. But, Mr. Early is mistaken. In *Hartman*, the

> Supreme Court never discussed the propriety of a remedy in the first instance, as this was not raised or briefed before the Court. And importantly, the Supreme Court in *Abbasi* did not mention *Hartman* in its discussion of the three cases in which it recognized an implied right of action for damages under *Bivens*.

*Andrews v. Miner*, 301 F. Supp. 3d 1128, 1134 (N.D. Ala. 2017). *Abbasi* held that the claim at issue in that case was a new *Bivens* context because it "b[ore] little resemblance to the three *Bivens* claims the Court has approved in the past. 137 S. Ct. at 1860. The Supreme Court has not previously recognized a *Bivens* remedy in a First Amendment retaliation claim brought by a prisoner. In fact, "[t]he Supreme Court has never implied a *Bivens* action under any clause of the First Amendment." *Vanderklok*, 868 F.3d at 198 (citing *Reichle v. Howards*, 566 U.S. 658, n.4 (2012) ("We have never held that *Bivens* extends to First Amendment claims.")). "Instead, it has, solely for analytical purposes, assumed that such an action exists. It has not actually decided the matter." *Id.*

Abassi held that if the questioned claim is indeed a "new *Bivens* context" claim, then the district court must ask whether "'any alternative, existing process for protecting the [injured party's] interest.'" *Abbasi,* 137 S. Ct. at 1858 (quoting *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007)). "[T]he existence of alternative remedies usually precludes a court from authorizing a *Bivens* action." *Abbasi*, 137 S. Ct. at 1865. And this Court must also consider whether special

factors counsel hesitation in recognizing a *Bivens* remedy.

Accordingly, the Court considers whether the type of "special factors" discussed by the *Abbasi* court as justifying extending *Bivens* liability are present here. In *Abbasi*, the Supreme Court clarified what constitutes a "special facto[r] counselling hesitation." *See* 137 S.Ct. at 1857. "[T]he inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Id.* at 1858. A court must assess the impact of an implied damages remedy on "governmental operations systemwide," such as "the burdens on Government employees who are sued personally, as well as the projected costs and consequences to the Government itself." *Id.* If "Congress might doubt the efficacy or necessity of a damages remedy" in a particular context, "courts must refrain from creating the remedy" to respect the separation of powers. *Id.*

"'Nationwide, district courts seem to be in agreement that, post-*Abbasi*, prisoners have no right to bring a *Bivens* action for violation of the First Amendment.'" *Akande v. Philips*, 1:17-cv-01243-EAW, 2018 WL 3425009, at *8 (W.D.N.Y. July 11, 2018) (quoting *Free v. Peikar*, No. 1:17-cv-00159-AWI-MJS, 2018 WL 1569030, at *2 (E.D. Cal. Mar. 30, 2018)). This District has concluded the same. *See Harris v. Dunbar*, 2:17-cv-536-WTL-DLP, 2018 WL 3574736, at *4 (S.D. Ind. July 25, 2018) (no *Bivens* claim for inmate's First Amendment mail claim); *Badley v. Granger*, 2:17-cv-0041-JMS-DLP, 2018 WL 3022653 (S.D. Ind. June 18, 2018) (no *Bivens* claim for inmate's First Amendment retaliation claim); *Albrechtsen v. Parsons*, 1:17-cv-1665-JMS-TAB, 2018 WL 2100361 (S.D. Ind. May 7, 2018) (no *Bivens* claim for First Amendment retaliation claim); *Muhammad v. Gehrke*, 2:15-cv-334-WTL-MJD, 2018 WL 1334936 (S.D. Ind. Mar. 15, 2018) (inmate's First Amendment retaliation claim not viable under *Bivens*).

Turning first to whether Mr. Early has alternative remedies he may use to address his retaliation claims, he has, of course, the BOP's administrative remedy process. He may bring retaliatory conduct to the attention of administrators and seek non-monetary remedies. For any injuries he might have sustained, he is able to bring a claim under the Federal Torts Claim Act. Any retaliation that extends his confinement might be actionable in habeas corpus. And any retaliation that results in a violation of a previously recognized *Bivens* claim is another alternate remedy Mr. Early may pursue. Mr. Early is simultaneously litigating an Eighth Amendment claim under *Bivens* and a tort claim under the FTCA in this case, involving many of the same injuries he complains about with regard to his First Amendment claim. He has also filed grievances concerning some of the allegations in this action. Thus, Mr. Early is not without a remedy to address the core concerns of his problems and this Court concludes that Mr. Early has alternative remedies he may use to address the alleged retaliation.

Here, expanding *Bivens* to Mr. Early's retaliation claims would implicate the BOP's policies regarding cell searches, the National BOP Waiting List for dental treatment, and medical record keeping. The federal employees charged with these decisions and responsibilities for these programs would face increased litigation costs in defending such claims. "First Amendment retaliation claims, requiring inquiry into a defendant's subjective state of mind, often would present genuine issues of material fact not easily resolved on summary judgment. This, in turn, would necessitate trials and further increase litigation costs." *Andrews*, 301 F. Supp. 3d at 1135 (N.D. Ala. 2017) (discussing special factors and declining to extend *Bivens* liability to a First Amendment retaliation claim).

Finally, "legislative action suggesting that Congress does not want a damages remedy is

itself a factor counseling hesitation." *Abbasi*, 137 S. Ct. at 1865. As noted by the Supreme Court:

> Some 15 years after *Carlson* [*v. Green*, 446 U.S. 14 (1980) ] was decided, Congress passed the Prison Litigation Reform Act of 1995, which made comprehensive changes to the way prisoner abuse claims must be brought in federal court. So it seems clear that Congress had specific occasion to consider the matter of prisoner abuse and to consider the proper way to remedy those wrongs. This Court has said in dicta that the Act's exhaustion provisions would apply to *Bivens* suits. But the Act itself does not provide for a standalone damages remedy against federal jailers. It could be argued that this suggests Congress chose not to extend the *Carlson* damages remedy to cases involving other types of prisoner mistreatment.

*Id.* (internal citations omitted). Congress has been active in the area of prisoners' rights, and its decision to not create a damages remedy for federal prisoners alleging mistreatment is a reason for the courts to not create a new *Bivens* claim.

For these reasons, Mr. Early's First Amendment retaliation claims are foreclosed by *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017). The retaliation claims are not one of the three *Bivens*-type claims recognized by the Supreme Court. Mr. Early has administrative and other judicial remedies available to him for the underlying incidents that gave rise to the instant claims, and the nature of the instant claims are not of such gravity to require judicial intervention and the creation of a new *Bivens* action. The individual defendants' motion for judgment as a matter of law on the First Amendment claims is **granted**.

## V. Conclusion

For the reasons explained above, the United States' motion for summary judgment, dkt [117], is **denied.** The FTCA claim against the United States based on the dental care provided to Mr. Early shall proceed.

The individual defendants' motion for summary judgment, dkt [115], is **granted in part and denied in part.** The motion is granted to the extent that the retaliation claims are dismissed.

This resolves all claims against Dr. Shepherd. The individual defendants' motion for summary judgment is **further granted** to the extent that defendant Christopher McCoy is granted summary judgment as to all claims alleged against him. The individual defendants' motion for summary judgment is **denied** to the extent that the Eighth Amendment deliberate indifference claims against Ms. Rhoads shall proceed.

The United States' and individual defendants' collective motion to exclude the expert testimony of Dr. Jesus Cortes, dkt [137], is **denied.**

The **clerk is directed** to update the docket to reflect that defendants Christopher McCoy and R.D. Shepherd are dismissed. The remaining claims will be resolved through settlement or trial.

**IT IS SO ORDERED.**

Date: 9/21/2018

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

LOUIS H. EARLY
13403-052
TERRE HAUTE – FCI
TERRE HAUTE FEDERAL CORRECTIONAL INSTITUTION
Inmate Mail/Parcels
P.O. BOX 33
TERRE HAUTE, IN 47808

Christine Astbury
ICE MILLER
chrissy.astbury@icemiller.com

Stephanie Carowan Courter
ICE MILLER LLP
stephanie.courter@icemiller.com

Gina M. Shields
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
Gina.Shields@usdoj.gov

Philip A. Whistler
ICE MILLER LLP (Indianapolis)
philip.whistler@icemiller.com